MilligaN, J.,
delivered the opinion of the court:
This suit was brought by original petition to recover the estimated price of certain buildings, known as the “ sutler buildings,” standing on the military reservation at Fort Eiley, in the State of Kansas. The petition was filed in 1868, and the action is founded on an alleged contract with the United States. Pending the action, in 1869, one Julia A. Eich, the widow and administratrix of Hiram Eich, deceased, filed her petition of interpleader in this case, in which she sets up and claims an equitable interest in the property alleged to have been contracted to the defendants, and claims, under a subsequent compromise entered into between herself and the petitioner, $2,000 of the purchase price, for which she asks a separate judgment of this court.
The facts on which the case rests are found to be as follows:
1. The property in question was erected by Eobert Wilson, on the “ Government reserve ” at Fort Eiley, Kansas, and consists of a dwelling-house, storehouse, billiard saloon, &c., which he occupied and used as sutler of the post until about the 20th of June, 1863, when he and his wife, for the consideration of $6,500, by their joint deed, conveyed it to the petitioner, Henry F. Mayer.
2. This conveyance, as shown by a written instrument, executed by the petitioner on the 19th of August, 1863, was made to him for the use and benefit of the estate of Hiram Eich, deceased, and as the agent of this estate. He declares in the instrument he has no other interest in the conveyance than as agent, and promises to reconvey the houses whenever it may be advisable to do so.
In addition, the petitioner, on the same day on which this instrument bears date, leased the property in question from the administratrix, .at a yearly rental of $600, for the term of three years from the 20th of July, 1863.
3. Prior to the date of the conveyance to the petitioner, Wil-•sou and wife, on the 11th of April, 1862, executed a mortgage on this property to Messrs. Chase & Brother, of St. Louis, Missouri, to secure the payment of a note for $3,500 81, executed on the same day by Eobert Wilson to the mortgagees, and due at twelve months from date, bearing ten per cent, interest from the date.'
*324 4. This mortgage was transferred and assigned by Chase & Brother, on the 11th of August, 18C5, to Mrs. Bich; and by her, on the 24th of February, 1866, to the petitioner; and by him, on the 28th of June, 1866, reassigned to Mrs. Rich, who now appears to hold the entire interest in the mortgage, and the note upon which it is predicated, in her own right. The sum of $1,961 83 has been paid on the note,- and the remainder, with interest, still remains due.
5. In this state of the title, without undertaking here to investigate its validity, or to determine the lawful owner, the petitioner, being in possession and claiming title, assumed to transfer it; when, on the 5th of April, 1866, Brevet Colonel J. W. Davidson, commanding Fort Riley, served an order on him, forbidding him to dispose of the property until the decision of the Secretary of War could be obtained in reference to it.
5a. The Quartermaster General, Meigs, states that Lieutenant General Sherman forwarded the papers with the remark,, that the sutler Mayer should be allowed to sell to his successor, or the government should buy the buildings at an appraisement.
6. On the 26th of May, 1866, the Quartermaster General concurred in the recommendation of General Sherman,, that these' buildings be purchased by the Government at an appraised value, and recommended an api>raisement “ with a view to ashing for an appropriation from Congress for their purchase.”
.. 7. A board of appraisal was convened on the 2d of July, 1866, which determined that $10,000 was a fair valuation of the buildings in their present condition.
8. On the llt-h of July, 1866, Julia A. Rich interposed her claim on the buildings, founded, as before shown, on the $3,500 and mortgage to Chase & Brother, which were assigned to her.
9. On the 26th of November, 1866, Mr. R. McBratney, attorney for the claimant, addressed a letter to the Quartermaster General, denying the validity of Mrs. Rich’s claim.
10. On the 18th of December, 1866, General Meigs submitted the papers to the Secretary of War, suggesting that the buildings would be useful, and that their purchase “ he completed upon valid deeds being executed and approved by the Attorney General.” This recommendation was approved by General Grant on the 31st of December, 1866 ; and on the 3d of January, 1867, the Secretary of War indorsed the paper as fol *325 lows : “ Recommendations approved ux>on condition that the owner first furnish evidence satisfactory to the Secretary of War of bis ownership of the property proposed to be purchased.”
11. On the 12th of January, 1867, the claimant’s attorney, Mr. McBratney, after acknowledging notice of the Secretary’s decision, proceeds to say: “In reply, I have the honor to state that H. F. Mayer relies upon the deed of conveyance of Robert Wilson, by which the title to the property was vested in him, which deed is now on file with the other papers of the case. Mr. Mayer proposes to convey the property by a general warranty deed,” &c.
12. The deed from Wilson and wife was submitted to the Secretary of War for his decision as to its validity as a muniment of title, and it was referred by the Secretary to the Judge Advocate General for his decision, who on the 21st of January, 1867, made his report. And after reviewing Mrs. Rich’s claim, proceeds to say: “ It is therefore recommended that the case be referred to the commanding officer at Fort Riley, with instructions to advise the parties, or their attorneys, that the United States will not complete the purchase until they both furnish deeds, or a joint deed of their respective title, interest and claims in the property, and shall make some arrangement ■among themselves for the receipt and division of the purchase money, by which the government and its officers shall be discharged from all responsibility or concern in regard thereto— the said arrangement and discharge to be part of the contract, and to be set forth in the deed or deeds as having been made and agreed upon by and between the parties.”
13. On the 6th of February, 1867, the coinmandant of the post at Fort Riley, Brevet Major General Custer, notified the parties of the decision of the War Department, and requested that they inform him of their decision at their earliesP convenience.
14. To this communication the claimant’s attorney responded, under date of the 13th of February, 1867, and after denying Mrs. Rich’s equity or claim on the property, and insisting on the validity of Mr. Mayer’s title, he says: “ Mr. Mayer proposes that, on the payment to him of the appraised value of the sutler property at Fort Riley, he will deliver the deed already referred to, and also enter into a bond in double the amount of *326 the purchase-money, with approved security, conditioned to defend the title of the property against all persons, to pay off and discharge all judgments of foreclosure of mortgages against the same, and to indemnify the Government against all losses, costs, or damages sustained in proceedings in law in derogation of the title to said property. Should this proposition be assented to, Mr. Mayer is prepared to enter into bond at any time.”
15. On the 25th of April, 1867, Mrs. Eich wrote to the house of J. H. Larkin & Co., of St. Louis, in which she insists on the validity of her claim on the property, and states the amount at $3,482, but sa.ys: “ I will join with Mr. Mayer immediately in making a sufficient deed of the property to the United States, and upon the delivery of the same, I will expect to receive of the quartermaster at Fort Leavenworth, or through your house, the sum of $2,000, which amount I am willing to take in order to have the matter settled.”
16. Larkin & Co., as it appears, submitted this proposition to Mr. Mayer, and he, on the 14th of May, 1867, responds to them and after utterly denying Mrs. Eich’s claim, peremptorily declines her proposition; and the next day wrote to the Quartermaster General at Washington, assigning reasons for not accepting it, and insisting on an acceptance of his proposition, made through his agent, Mr. McBratney.
17. On the 16th of June, 1867, the acting Quartermaster General advised the Secretary of War that the parties had been advised by the commanding officer of the decision of the judge advocate, and that Mrs. Eich had made no reply, and the claimant declined to execute a joint deed with her, orto acknowledge her claim on the property.
In this state of the case, the Acting Quartermaster General, on the authority of Major General Easton, chief quartermaster of the Department of Missotui, recommended that the order for the purchase be withdrawn, as the property was not likely to be useful much longer to the Government.
18. This recommendation seems to have had the effect of reconciling the differences between the claimant and Mrs. Eich; for it appears that, on the 11th of July, 1867, they did join in deeds to the United States, upon the terms previously proposed by Mrs. Eich, and transmit them to the Secretary of War, through General Eucker, on the 15th of August, 1867.
In transmitting them he says: “The delay in furnishing, *327 these deeds having been so long prolonged by the non-agreement of the parties claiming the ownership of the property, and the necessity for the retention of Fort Biley being rapidly diminishing, I see no reason for changing my recommendation in the premises, contained in my report, dated June 10,1867, before herein referred to, and which reads as follows, viz : ‘ That the order for the purchase of these buildings be rescinded, and that the rival claimants to the property be so advised.’ ”
19. On the 20th of August, 1867, the War Department concurred in this recommendation, which terminated this long and tedious negotiation about the sale of the property in question.
On these facts it is insisted that the negotiations of the parties resulted in a complete and valid contract of purchase and sale, and that the United States are legally bound to accept the deeds tendered, and to pay over the appraised value of the property.
Assuming that the loyalty of the claimant is sufficiently established to entitle him to a standing in this court, we are called upon, in the first place, to answer the foregoing, proposition : Did the negotiations of the parties result in a contract which this court can execute and enforce1? Three things are necessary to the validity of every; contract — the thing sold, which is the object of the contract, the price, and the consent of the contracting parties. “ There is,” says Parsons on Contracts, vol. I, p. 475, “ no contract unless the parties thereto assent, and they mast assent to the same thing, in the same sense. A mere assent does not suffice to constitute a contract, for there may be an assent in matter of opinion, or in some fact that is done and completed at the time, and therefore leaves no obligation behind it. But a contract requires the assent of the parties to an agreement, and this agreement must be obligatory, and, as we have seen, the obligation must, in general, be mutual. This is sometimes briefly expressed by saying that there must be a request on the one side and an assent on the other. A mere affirmation or proposition is not enough. Nor is this any more a contract if it be in writing than if spoken only. It becomes a contract only when the proposition is met by an acceptance which corresponds with it entirely and adequately.”
The assent, by all the prevailing authorities, must comprehend the whole of the proposition, and be exactly equal to its *328 extent and provisions, and it must not qualify them by any new matter.
But before applying these principles to the case under consideration, it is proper to remark, it is admitted that the land on which the buildings in question are located belongs to the United States; and, upon elementary principles, the buildings constitute a part of the freehold, and when it is sold the build- ' ings permanently attached to the soil pass with it. But waiving this principle, and treating the case in the light in which the parties appear to have considered it, we come to the application of the facts of this case to the principles of law which have been announced.
It is obvious on the facts that there was no valid contract in respect to these buildings, at any time entered into by the parties, which this court can execute and enforce. The assent of the contracting parties to the terms of sale, fixed by the Secretary of War, under whose authority the United States offixcers acted, is entirely wanting, without which there can be no binding agreement. The price, it is true, was fixed by the board of appraisers, but the conditions on which the money was to be paid and the contract closed were never complied with by . the claimant until after the proposition was withdrawn by the United States. The right of one contracting party, pending negotiations, to withdraw any proposition made to the other before it is accepted, cannot be questioned; and a,mere voluntary compliance with the conditions of the proposition afterward does not render the other liable on it. (Johnson v. Fessler, 7 Watts, 48; Ball v. Newton, 7 Cush., 59.)
But this right was not exercised hastily,- or in a manner calculated to prejudice the claimants. The petitioner had declined the'proposition, and Mrs. Rich had remained silent with respect to it for more than one month before it was withdrawn. Now, to enforce the contract alleged in the petition would be to make a new contract for the parties, and enforce it against the will of the defendants. This no court can do.
The respective rights of the claimants need not be inquired into, as neither of them, in the view we have taken of this case, has any right of recovery against the United States.
The petition must be dismissed.